# In the United States Court of Federal Claims

No. 18-121C
(Filed: April 20, 2018)
(Re-filed: June 15, 2018)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

TRANS DIGITAL TECHNOLOGIES, LLC,

    *Plaintiff,*

v.

THE UNITED STATES,

    *Defendant*,

and

INTEGRAL CONSULTING SERVICES, INC.,

    *Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * *

    *Damien C. Specht*, with whom were *Ethan E. Marsh* and *James A. Tucker*, McLean, VA, for plaintiff.

    *Allison S. Vicks*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Lisa L. Donahue*, Assistant Director, for defendant. *Tudo Pham*, United States Department of State, of counsel.

    *Richard P. Rector*, Washington, DC, with whom were *Dawn E. Stern* and *Ethan M. Brown*, for intervenor.

---

[1] This opinion was originally issued under seal. The parties offered joint proposed redactions. We adopt the proposed redactions because we find them to be appropriate. Those redactions are indicated herein with brackets.

OPINION

BRUGGINK, *Judge*.

This is a post-award bid protest brought by Trans Digital Technologies, LLC ("Trans Digital"). Defendant is the United States acting through the Department of State ("DOS"). The awardee, Integral Consulting Services, Inc. ("Integral"), intervened. Trans Digital's complaint asks the court to enjoin DOS from awarding to Integral. The parties filed cross-motions for judgment on the Administrative Record ("AR"). Oral argument was held on March 7, 2018, at the conclusion of which we announced that we would deny plaintiff's motion and grant defendant's and intervenor's cross-motions. Judgment was deferred pending issuance of this opinion. Because plaintiff has not shown that the agency's evaluation of the first factor was arbitrary or that it was prejudiced by any alleged errors, the government is entitled to judgment.

BACKGROUND

On July 29, 2014, DOS issued a request for proposals ("RFP") for the next generation of its passport printers to be installed in consulate and passport offices around the world. The RFP promised award to a single offeror of an indefinite delivery, indefinite quantity ("IDIQ") contract for high and low-capacity passport printers along with support services and consumable printer supplies. The RFP promised an order of at least one each of high and low-capacity printers and no more than 30 high-capacity printers and 100 low-capacity printers. The RFP stated that DOS was seeking to replace its current passport printer systems in order to allow it to issue new passports with enhanced "security, durability, and quality." AR 467. The printers were thus to feature the ability to produce "laser-engraved personalization data on a polycarbonate data page and an inkjet personalized image along with applicable endorsements . . . ." *Id.*

The contract was originally awarded to Integral on November 30, 2015. Trans Digital protested that award at the Government Accountability Office ("GAO") on grounds not relevant to the present action. The agency volunteered to take corrective action, and the protest was dismissed as academic. DOS reissued the RFP via amendment on November 1, 2016, which asked for revised proposals from the offerors.

The revised RFP called for award on a best-value basis with a tradeoff between price and technical factors. The four technical factors, in descending order of importance, were (1) Technical Capability and Demonstration Printer Testing, (2) Previous Demonstrated Production Experience, (3) Key Personnel, and (4) Past Performance. AR 544. Technical capability was significantly more important than the other non-price factors, all of which, when combined, were significantly more important than price. *Id.*

Section M of the RFP described the agency's evaluation criteria. For the technical capability factor, DOS stated that it would "evaluate the Offeror's demonstrated capabilities and proposed approach to completing all requirements in Section C." *Id.* at 545. Proposals were to "demonstrate a comprehensive understanding of the nature and scope of work required." *Id.* Offerors were thus required to show a "demonstrated ability to provide high operational availability" of their printers and to show "the ability to meet the performance standards in Section F." *Id.* Section M.10 also promised that printer capabilities would be tested "in accordance with Attachment C." *Id.* at 546. The capabilities tested from Attachment C were scored on a 0-10 scale with 0 representing a failure to meet expectations; a score of 5 was award for meeting a test requirement, and a 10 was awarded when a printer exceeded the expectation. *Id.* These scores were then added together and "used to assign an adjective rating in accordance with section M.11." *Id.*

A rating of "Excellent" meant that the proposal met all requirements and had "features that offer superior advantage to the government," and those advantages/strengths substantially outweighed disadvantages/weakness. *Id.* This would be reflected in a numerical score between 209 and 265 for the demonstration printer testing.

A rating of "Good" meant that the proposal met the solicitation requirements and had some advantages to the government. These advantages/strengths "generally outweigh[ed] any disadvantages/weaknesses." *Id.* 546-47. A "Good" rating was reflected in a printer testing score between 132 and 208.

A "Satisfactory" rating meant that the proposal met all of the RFP's "basic" requirements but did not offer any significant strengths or advantages to the government. Any disadvantages or weaknesses were not significant, or if they were, were outweighed by other significant proposal strengths. Such

a rating would result from a testing score of 131. Lower adjectival and numerical scores are not relevant to this protest.

For the second factor, Previous Demonstrated Production Experience, the agency stated that it would evaluate the offeror's experience for "the degree of relevance to the requirement on the basis of similarity in size, scope, complexity, technical difficulty, and dollar value." *Id.* at 546.

The price factor was evaluated on overall proposed prices, including all options. The RFP stated that DOS would evaluate the offerors' prices for fairness and reasonableness and that the agency would use one or more of the "analysis techniques stipulated in FAR 15.404 to conduct the evaluation." *Id.* at 548.

I. Testing And Evaluation Results

Offerors provided a low and high-capacity printer to DOS for testing. The Government Printing Office ("GPO") provided 30,000 passport booklets for the tests. Prior to testing, members of the Technical Evaluation Panel ("TEP") noted [                                                      ], but testing was went ahead anyway.

The agency devised 38 tests from RFP sections C and F; three of which were from section F. It is those three tests that are highlighted by the protestor for our consideration. Test 23 was for waste and spoilage, and tests 24 and 25 were concerned with uninterrupted service.

Section F.6 of the RFP, Technical Performance Standards, laid out the standards which the agency required the offerors' printers to meet for uninterrupted service and waste. For service uptime, the standard was "an ability to personalize passports within four hours." AR 401. This meant that, at a installation that had two printers, one could be down for up to 2 business days at a time. In installations with only one printer, service was required to be restored within 4 hours. *Id.* This translated to an Acceptable Quality Level ("AQL") of 95 percent uptime during normal working hours. For waste and spoilage, the standard was minimization of booklets rendered useless. The AQL was "less than .5% of the passport books that enter the . . . Printer shall be damaged, destroyed, or rendered useless by the [printer]." *Id.* at 402. Failure to meet these standards would result in a 2% reduction in the monthly fixed price per unit. *Id.* at 401-402. Further, at the end of the year, if awardee

performance "predominately equal[ed]" the AQL, the agency would award a "Satisfactory" CPARS rating. *Id.* at 402. Performance surpassing the AQL would net a "Very Good" or "Exceptional" CPARS rating. *Id.*

### A. Printer Demonstration Testing Results

After proposals were submitted, DOS conducted the demonstration testing in early April 2017. Each offeror was tested separately for a total of five test runs. The TEP performed most of the tests and a government contractor, Noblis, performed the remaining tests. Integral was tested first.

The TEP's test summary for Integral, dated April 6, 2017, records that "test runs were slowed by jams and errors that stopped the printer" and that this "often resulted in books with incomplete personalization." AR 1422. The TEP also recorded that some "books were not printed or engraved" and that books had to be removed due to jams. *Id.* Additional notes from the testing of Integral's low capacity printer indicates that the third batch printed 196 out of 200 successfully. AR 4127. There are no entries for waste and spoilage for the high capacity printer. AR 4130.

The TEP's test summary for Trans Digital, dated April 7, 2017, did not record the same frequent jams or incomplete personalization: "Very few jams and errors stopped the printers resulting in good throughput." AR 1467. "All throughput tests exceeded the throughput requirements." *Id.* Both offerors faced some difficulty due to stickiness which caused books not to feed into the printers' hoppers. This apparently did not cause frequent jamming for Trans Digital, however. The notes from testing for Trans Digital do not indicate waste and spoilage figures and instead the box for test 23 states that "Noblis will provide results." *E.g.* AR 4139. The boxes for tests 24 and 25 also indicated that those tests were to be deleted.

In the TEP's statement of facts to the GAO, however, the agency represented to GAO that it was Noblis who authored the summaries cited above and that the report of Integral's jamming did "not reflect the consensus evaluation of the TEP." AR 1671. The TEP did confirm that Integral faced jams and incomplete personalization during its test. The agency explained, however, that those results were [

]

B.  Amendment 8

On April, 13, 2017, after testing was complete, the Contracting Officer ("CO") issued Amendment 008, which revised sections L and M of the RFP to remove tests 23, 24, and 25 from the agency's consideration.  The reason stated in the amendment was that these three tests "were not conducive for the testing environment and are therefore removed from Attachment C.  Testing did not include these three tests."  AR 540.  The amendment also changed the numerical scoring for several tests because DOS realized those tests could only be passed or failed, meaning that only a score of 0 or 5 could be awarded; no 10 could be awarded for exceeding requirements.

C.  Technical Ratings

DOS also evaluated the other RFP requirements and any additional security features offered by offerors' proposed printers based on proposals and testing results.  Integral's ratings were as follows.

1. Integral's Ratings

For the Technical Capability and Demonstration Printer Testing factor, the overall rating was "Excellent."  Integral was scored 240 out of 265 possible testing points.  This resulted in a significant strength in the view of the TEP. The agency also found five other significant strengths offered by Integral, each tied to a RFP requirement.  Those were:

> 1.  Personalization of [      ] optical variable device ("OVD")--The TEP stated that this feature exceeded the agency's requirement and would provide additional security for passports.
>
> 2.  A [    ] quality assurance check of image quality–The solicitation required printers to provide three quality assurance checks of the image quality of the printed pictures in the passport booklets.  Integral's printer provided a [    ] check, which the agency found would offer even greater security against the issuance of flawed or defective passports.

3. [              ] inkjet printing–[            ] inkjet printing exceeded the normal inkjet printing required by the RFP and was particularly enticing to DOS because it offered [              ], which the TEP found to provide a variety of benefits.

4. Proposed subcontractor builds its own lasers–The TEP stated that the in-house manufacture of the printers' lasers by Integral's subcontractor shortened the supply chain and lessened risks of supply disruption.

5. Transition plan–The TEP found the transition plan laid out in Integral's proposal to be particularly comprehensive and detailed, allowing the agency to better plan its own work as part of the transition period.

AR 3912-14.

Integral's proposal was also found by the agency to offer an additional six strengths for various features and 12 strengths associated with different test results from the demonstration testing. *See id.* at 3914-15. The agency did not find any weaknesses or deficiencies in Integral's proposal.

### 2. Trans Digital's Ratings

Trans Digital received a score of 220 out of 265 points, which also translated to an adjectival rating of "Excellent." Thus, like Integral, the TEP awarded Trans Digital a significant strength for its testing scores. The TEP did not, however, find any other features under the technical capability factor that it evaluated to be worth a significant strength. The TEP awarded seven regular strengths associated with those test results, and found an additional seven strengths for various features of Trans Digital's proposal. *See id.* at 3921-22.

The TEP did assign one weakness to Trans Digital's proposal regarding a proposed full-time printer maintenance position. The agency found this position to be potentially wasteful of resources given Trans Digital's estimate that only 75 minutes were needed per month to perform preventative maintenance. *See id.* at 3922.

### D. Previous Demonstrated Production Experience

For the second factor, Previous Demonstrated Production Experience, Integral was evaluated as "Excellent" overall and Trans Digital received a "Satisfactory" rating. The TEP found significant differences between the proposals under this factor.

#### 1. Integral's Ratings

The TEP awarded a significant strength for "demonstrated highly relevant experience laser-engraving passports throughout the world." *Id.* at 3915. The agency stated that Integral had installed over 100 of their offered printer systems worldwide since the year 2000. It cited experience in Belgium, Norway, and Sweden as exhibiting "the most complex personalization" and stated that Integral's experience in Sweden and Ireland "exceed the NextGen requirements." *Id.* at 3916. It listed the personalization and security features offered in those countries' systems purchased from Integral and stated that those "systems are complex and comparable to the complexities and technical difficulty of the Government's requirements." *Id.* It summed up its finding in this regard by stating that Integral had experience with "nearly a dozen countries with the same services that the Government is requesting." *Id.* The total value of those contracts was also found by the agency to be relevant to DOS's needs in this procurement. The agency further listed two additional strengths relating to system integration and longevity of its printer systems used by other countries. *See id.* No weaknesses were assigned to Integral's proposal for the second factor.

#### 2. Trans-Digital's Ratings

Trans Digital was evaluated as having a "Satisfactory" overall rating for the second factor. No significant strengths were awarded by the agency. DOS did find one strength for Trans Digital related to its experience with personalizing passports for DOS in the past. AR 3923 (citing 18 years of Trans Digital's printers being used at DOS). One weakness was also assessed by the TEP for Trans Digital's lack of "experience with ePassport polycarbonate personalization programs." *Id.* The TEP stated that Trans Digital had provided only one example of experience using laser engraving (Montenegro). The TEP thus found a risk to the agency "given the anticipated volume of ePassport polycarbonate personalization per the RFP." *Id.*

E.  Key Personnel and Past Performance

For the third factor, Key Personnel, Integral was rated as "Satisfactory" overall and Trans Digital was rated as "Good."  For the fourth factor, Past Performance, Integral received a "Significant Confidence" rating because DOS found the intervenor to have had uniformly positive past performance ratings and past performance references that were similar in size, scope, and complexity to the effort solicited by the RFP.  Trans Digital's references were more mixed, ranging from "Marginal" to "Excellent."  The TEP also found several of the presented references to not be comparable to the complexity of DOS's NextGen effort.  DOS thus rated itself as having "Confidence" in Trans Digital's ability to successfully perform based on its past performance experience.  None of these ratings were challenged by the protestor in its motion for judgment, and thus no further discussion about them is necessary.

F. Price

Integral initially offered a total evaluated price of $98,497,183.38.  After discussions and final proposal revisions, its offered price was $96,835,383.  Trans Digital's final evaluated price was $41,609,579.

The agency's initial internal government cost estimate ("IGCE") was $67,461,381, which was set in December 2016.  After initial proposals and discussions, the agency updated its cost formulas and adjusted the IGCE significantly upward to $156,130,341.  The estimate rose dramatically primarily due to the agency's adjustment of its estimated number of needed printers and a change in its warranty price estimate.  It reduced its estimated throughput and eliminated the mid-capacity printer, replacing it with only low-capacity printers, both of which increased the number of needed printer systems.  The other large driver of costs was the estimate for warranties, which was initially only a placeholder number.  The revised figure, based on actual market survey data, increased the cost estimate for both types of printers by $58,000,000.

DOS determined that offers were fair and reasonable by comparing them to each other and to the IGCE.  *See* AR 3937.  The agency did not find the fact that both offers were significantly below its upwardly revised estimate troubling because the IGCE was based on market research conducted in 2014; and the agency explained that it expected technological advancement and market competition to have driven down prices since then.  *See id.* at 3937-38.

DOS also explained why its estimates for consumables and warranty items were significantly higher than the offers received and found no basis on which to be concerned that prices were too low.

II.   Award Decision And Protest History

After the early April 2017 testing, the TEP met for a preliminary consensus discussion.[2] The CO then sent final discussion questions to offerors on April 14, 2017. Final revised proposals were submitted on April 27, 2018. Those were then evaluated by the TEP, which reached a draft consensus recommendation on May 2, 2017. The final TEP consensus memorandum was dated September 26, 2017. In it, the ratings discussed above were presented to the CO, and the TEP recommended award to Integral.

The TEP's recommendation was based first on three significant strengths from the technical capability factor–personalizing [    ] OVD, a [    ] image quality check, and the use of [    ] inkjet printing–as providing "superior security capabilities," which, in its view, would "make the US passport almost impossible to counterfeit." AR 1546. The TEP also relied on intevenor's superior rating for the second factor, citing its demonstrated experience with "laser-engraving on polycarbonate datapages." *Id.* at 1547. Integral's experience in Belgium, Ireland, Norway, and Sweden was further touted as giving the TEP assurance that Integral could provide the sort of complex personalization that the agency sought.

The CO made her decision to award to Integral on September 29, 2017. That decision was approved by the Source Selection Authority. In the decision document, the CO adopted the TEP's ratings, finding no fault with any of them. Because the technical capacity factor was significantly more important than all of the other factors, she found Integral's proposal to offer the best value to the government. She cited significant security features and other technological and operational benefits as offering a superior advantage to DOS. *See* AR 1572. "Because Integral's proposal offers a superior personalization printer technology and solution to achieve the most secure, durable, and high quality passport book for DOS, Integral offers the best value to the Government." AR 1572-73.

---

[2] The record does not contain any documentation from that event.

Trans Digital filed a protest at GAO on October 10, 2017. DOS then stayed the contract award as mandated by 31 U.S.C. § 3553(b)(2)(A) (2012). Trans Digital argued to GAO that the agency had evaluated the proposals using an unstated evaluation criteria by going beyond the testing results and that the agency had misled it during discussions. GAO denied the protest on January 17, 2018, explaining that the agency's evaluation of offerors' written proposals in addition to testing results was proper and anticipated by the RFP. GAO also found that Trans Digital had not shown prejudice from the discussions because it had not argued that it could have provided the relevant prior experience even had the agency properly disclosed what it was looking for. AR 1746-57; *Trans Digital Techs., LLC*, B-412521.2 *et al.*, 2018 CPD ¶ 58 (Comp. Gen. Jan. 17, 2018). Plaintiff filed suit in this court on January 8, 2018.

## DISCUSSION

Plaintiff's main protest grounds concern the evaluation of the technical capability factor. Its chief complaint is that agency unreasonably ignored the results of tests 23-25 during demonstration testing, the consideration of which was eliminated by Amendment 8. Although careful not to cast its argument as a direct challenge to the cancellation of those tests, plaintiff urges that it was irrational of the agency to decide that Integral could meet the waste and spoilage standards set out in Section F of the RFP given that it knew the results of the cancelled tests indicated otherwise, at least for one particular test run. Trans Digital points out that, despite the deletion of those tests from RFP Attachment C, Section M.10 stated that offerors were expected to meet the standards set out in Section F. Plaintiff finds nothing in Integral's proposal that it thinks ought to have assured the agency that Integral would not exceed the waste and spoilage limit. Plaintiff argues that it was thus irrational to ignore the test results despite the issuance of Amendment 8. Plaintiff also challenges the numerical scoring of the demonstration testing, arguing that it ought to have scored 235 points instead of 220 and that Integral should have scored 235 points instead of the 240 that it was awarded.

Plaintiff's other avenue of attack regards the second factor, Previous Demonstrated Production Experience. Plaintiff argues that Integral was unfairly credited with having too much relevant experience and that Trans Digital was misled by the agency during discussions, causing it to miss the opportunity to provide a reference that would have shown the agency the type of experience it was looking for.

We begin with the standard for any judicial review of agency administrative action, the arbitrary and capricious standard mandated by Administrative Procedures Act, 5 U.S.C. § 706 (2012). We decide bid protests under that same standard pursuant to 28 U.S.C. § 1491(b)(4) (2012). This is a highly deferential review, meaning that the court will not set aside agency procurement actions unless a protestor can show, from the administrative record, that the agency acted arbitrarily, capriciously, or otherwise illegally. *Impressa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2003). The standard is rationality. If the agency can cite a rational reason in the record for its actions, the court will leave them undisturbed. *Id.* at 1333 (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 446 (DC Cir. 1994)).

We also apply the rule of harmless error, requiring protestors to show that they were in fact harmed by agency actions alleged to be improper. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). It is the protestor's burden to establish prejudice by showing that there was a "substantial chance" it would have received the award but for the error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005). Without such a showing, the court will ignore the alleged the error.

I.  Technical Capability And Demonstration Printer Testing

Plaintiff is careful to couch its protest of the agency's consideration, or lack there of, of the results of tests 23-25 as a challenge to the the agency's evaluation of the technical capability factor, and not a challenge to Amendment 8. It cannot escape the fact, however, that it did not protest the deletion of tests 23-25 from the agency's consideration at the time and instead submitted a revised offer. It thus waived any challenge to the omission of those test's results from the agency's evaluation of the technical capability factor. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). When an agency changes its mind regarding an evaluation scheme and amends the solicitation to match that decision, an offeror may not have it both ways by ignoring the decision at the time, submitting a revised offer, and then abiding the outcome of the procurement before deciding whether to file a challenge. It is no answer for the protestor to couch its protest as aimed at the subsequent evaluation when the very error it alleges results from the changed evaluation scheme.

Thus it was not irrational for the agency to have decided that Integral could meet the waste and spoilage standards of Section F without considering the deleted tests. The agency documented its decision that, based on the information provided in the proposals, it had no concerns regarding the waste and spoilage standards for either offeror.[3] *See* AR 1673.

Plaintiff's argument regarding the scoring of its and Integral's other tests fails for a more fundamental reason. Plaintiff cannot show prejudice from this alleged error. Both plaintiff and intervenor scored within the "Excellent" range for that factor and were awarded that adjectival rating. Both were awarded a significant strength for their testing scores. Thus, even were plaintiff's score upped to 235 and intervenor's reduced to the same, the actual result from the agency would have been no different. There is therefore no basis to reject the agency's evaluation of the first technical factor.

II. Previous Demonstrated Production Experience

Plaintiff's protest regarding the second factor primarily poses the question of what standard the agency was using to measure the offerors' proffered previous experience. Plaintiff alleges that the agency changed its tune several times and affirmatively misled plaintiff during discussions by failing to disclose that it wanted to see experience with laser-engraving in combination with inkjet printing and chip personalization. Plaintiff also argues that the TEP gave Integral too much credit for its past experience based on the standard that the agency represented to GAO that it applied.

Trans Digital points out that its initial proposal was criticized by the agency for a lack of experience with laser engraving. Then, after final proposal revisions, the TEP found that Trans Digital's experience was still not relevant because it did not involve laser engraving in combination with inkjet printing. However, after the protest at GAO, the agency again changed tack, by representing in its report to GAO that it was looking for laser engraving of polycarbonate data pages in combination with color inkjet printing and chip personalization. Plaintiff argues that it was thus misled during discussions because of the agency's failure to inform it of what it was truly interested in.

---

[4] We also note that Section F will be self-enforcing during contract administration. Should Integral exceed the waste limit, the agency will reduce payment by two-percent per unit.

Plaintiff argues that the agency's changing standard is an attempt at *post hoc* rationalization of its high "Substantial Confidence" rating of Integral, which Trans Digital does not think is warranted.

We are less than sanguine about the agency's inability to clearly articulate what it was looking for under this standard and we recognize that plaintiff was likely misled by the agency during discussions. Nevertheless, plaintiff has again not shown how it was prejudiced. Trans Digital avers that, had it known what the agency wanted, it would have offered its experience providing printers to the Netherlands in 2008. It alleges that this printer system, although not the one currently offered to the government in response to the RFP, would have shown relevant experience with all three features that DOS was seeking.

Defendant points out that Integral had at least two references that met the three-feature standard: Belgium and Sweden. Defendant admits that the Norway reference did not include color inkjet printing, but also notes that the agency found this reference to be "not as relevant." Thus plaintiff is incorrect in its assertion that intervenor was unfairly credited with that experience. Regarding the Belgium reference, defendant avers that the agency used a database of known passports to discern that Belgium used color inkjet printing. *See* AR 1636 n.10. The RFP reserved to the agency the right to use publically available information to evaluate proposals. AR 190.

Even crediting plaintiff for its Netherlands experience, and recognizing that this may have eliminated the weakness that the TEP assigned for lack of experience with all three technologies, Integral's proposal would still have been superior under this factor with two references (Sweden and Belgium) that met the three feature standard as opposed to plaintiff's one. Although we cannot say whether plaintiff would have been upgraded in its adjective rating from "Satisfactory" to either "Good" or "Excellent," intervenor's rating would not have changed. Thus, even with equal ratings for the second factor, intervenor's advantage for the first factor would remain unchanged. It is clear both from the TEP's report and the CO's award decision document that it was the significant strengths under the first factor that were the discriminator between the two proposals. The conclusion is thus that plaintiff cannot show any prejudice from the errors that it alleges occurred under the second factor.

III. Price And Trade Off Decision

We are left then with the price reasonableness determination and the agency's final trade off decision. It is true that intervenor's proposal was significantly more expensive than plaintiff's, but that is not by itself controlling. DOS put offerors on notice that it was seeking enhanced security features above all else. Thus the technical capability factor was significantly more important than any other factor, and the non-price factors were significantly more important than price. The CO's decision is well-documented as to why she preferred intervenor's proposal. Both the CO and the TEP were uniform in their desire to purchase the enhanced features offered by Integral's printer systems. Having reserved the right to make an award to a higher-priced offeror, we cannot overturn that decision based only on a large delta between prices.

Further, plaintiff has not established an error in the agency's price fairness and reasonableness determination. The agency clearly explained how it reached its IGCE, how it upwardly revised that estimate, and why it viewed the fact that both prices were significantly below the internal estimate not to be of concern. Although plaintiff offers several speculations as to why the estimate ought not have been upwardly revised, we are in no position to second guess the agency's decision to do so. It was explained in the record in detail and we find no irrationality with it.

## CONCLUSION

Because plaintiff has not shown a basis on which to overturn the agency's decision to award to intervenor, we need not consider the factors for injunctive relief. We previously denied plaintiff's motion for judgment and granted the government's and intervenor's cross-motions by a brief order dated March 7, 2018. All that is left is judgment. Accordingly, the Clerk of Court is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge